**\*\* NOT FOR PUBLICATION \*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| HEARING COMPONENTS, INC., | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 9:07-CV-104 |
| | § | |
| v. | § | JUDGE RON CLARK |
| | § | |
| SHURE, INC. | § | |
| | § | |
| *Defendant*. | § | |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Hearing Components, Inc. filed suit against Defendant Shure, Inc. claiming infringement of United States Patent Nos. 4,880,076; 5,002,151; and 5,401,920. The '076 and '151 patents are directed toward a hearing aid ear piece or other sound transmission device connected to a disposable compressible foam sleeve. Shure moves for summary judgement of no infringement for: (1) asserted claims 1, 17, and 36 of the '076 patent on the basis that its devices do not meet the claim limitations of "hearing aid" or "sound transmission device" and lack "fastening" means; (2) asserted claims 1, 13, and 19 of the '151 patent, on the basis that its devices lack a "means on said exterior surface for disposably attaching the duct of the sleeve to a connecting portion"; and (3) asserted claims 1 and 2 of the '920 patent, on the basis that its devices are not "readily installed and replaced by a user" and do not contain a "thin flexible membrane."

Because genuine issues of material fact remain regarding whether Shure's accused devices infringe the asserted claims of the '076 and '151 patents, Shure's motion for summary

judgment is denied.  Additionally, as the court has found asserted claims 1 and 2 of the '920 patent indefinite, it does not reach the merits of Shure's argument that its devices do not infringe these claims.

## I.  Standard of Review

The party moving for summary judgment under Fed. R. Civ. P. 56 has the initial burden of demonstrating that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986).  Movant may show that the undisputed material facts affirmatively establish a right to judgment.  Alternatively, movant may establish that the other party has the burden of proof at trial, and has failed to "make a showing sufficient to establish the existence of an element essential to [its] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2522 (1986).

In order to avoid summary judgment, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348, 1335 (1986); *Anderson*, 477 U.S. 242, 257, 106 S. Ct. 2505, 2514.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita,* 475 U.S. 574, 586, 106 S. Ct. 1348, 1356.  Fed. R. Civ.  P. 56 requires HCI to set forth specific facts showing that there is a genuine issue for trial.  *Anderson,* 477 U.S. 242, 256, 106 S. Ct. 2505, 2514.  Only a genuine dispute over a material fact (a fact which might affect the outcome of the suit under the governing substantive law) will preclude summary judgment.  *Id.* at 248, 106 S. Ct. 2505, 2510.

The dispute in this case is genuine if the evidence is such that a reasonable jury, properly instructed on the correct evidentiary standard, could return a verdict for HCI on infringement. *Id.* at 255, 106 S. Ct. 2505, 2514 ("determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case."). If the factual context renders a claim implausible (for example if the claim simply makes no economic sense), nonmovants "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356.

Fed. R. Civ. P. 56(c) requires the court to look at the full record, including the pleadings, depositions, answers to interrogatories, admissions, and affidavits. All reasonable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, and any doubt must be resolved in its favor. *Id.* Only *reasonable* inferences in favor of the nonmoving party can be drawn from the evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468, 112 S. Ct. 2072, 2083 (1992).

## II. Discussion

A. Applicable Law

The determination of infringement, whether literal or under the doctrine of equivalents is "a two-step process in which we first determine the correct claim scope, and then compare the properly construed claim to the accused device to determine whether all of the claim limitations are present either literally or by a substantial equivalent." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1247-48 (Fed. Cir. 1998). Claim construction is an issue of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S. Ct. 1384 (1996). A determination

of infringement, whether literal or under the doctrine of equivalents, is normally a question of fact. *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1300 (Fed. Cir. 2001).

For literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Any deviation from the literal claim language precludes a literal infringement finding. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316,1330 (Fed. Cir. 2001).

The essential inquiry under the doctrine of equivalents is whether the accused product or process contains elements identical to or equivalent to each claimed element of a patented invention. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40, 117 S. Ct. 1040, 1054 (1997). "Under the doctrine of equivalents, an accused product that does not literally infringe a structural claim may yet be found an infringement if it performs substantially the same function in substantially the same way to obtain the same result as the claimed product or process." *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 1361 (Fed. Cir. 1983) (internal citations omitted).

"A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product was insubstantial." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1364 (Fed. Cir. 2007). One way to do this is by demonstrating "on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Id.*

B.  Analysis

Shure argues that its devices do not infringe the patents-in-suit because (1) they do not meet the limitations in claims 1, 17, and 36 of the '076 patent of "hearing aid" or "sound transmission device" and lack any "fastening" means; (2) they lack a "means on said exterior surface for disposably attaching the duct of the sleeve to a connecting portion" as required by claims 1, 13, and 19 of the '151 patent; and (3) they are not "readily installed and replaced by a user" and do not contain a "thin flexible membrane" as required by claims 1 and 2 of the '920 patent.

    1.  *'076 patent – "hearing aid" and "sound transmission device"*

The parties originally submitted over twenty terms spanning twelve claims for construction in this case.  After the court ordered that the parties should elect no more than ten disputed terms, they chose not to request construction of the terms "hearing aid" and "sound transmission device."  Beyond the citations to the patent and prosecution history found in their Joint Claim Construction Chart, neither party briefed these terms in any detail at the *Markman* stage.  *See* Pre-Hearing Statement, Ex. A, at p. 1, 14  [Doc. # 50].  In light of the Federal Circuit's decision in *O2 Micro International, Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351 (Fed. Cir. 2008), the court now construes these terms.

    a.  **Construction of "hearing aid"**

HCI argues primarily that "hearing aid" need not be construed because it is found in the preamble of asserted claims 1 and 17 of the '076 patent and does not actually limit the claims.  In the event that the court does find the term to be a limitation, HCI suggests that it be construed as a "device that enables a user to hear better quality sound."  Shure argues that the proper

construction is a "device worn in or behind the ear, for a hearing impaired person that amplifies (ambient or environmental) sound, excluding lightweight earphones and headphones."

### i. *"Hearing aid" in preamble*

Language in a preamble only limits a claim when it "states a necessary and defining aspect of the invention," not when it is "simply an introduction to the general field of the claim." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) (internal quotation omitted); *see also Symantec Corp. v. Computer Associates Int'l, Inc.*, 522 F.3d 1279, 1288-89 (Fed. Cir. 2008) ("[A] preamble is construed as a limitation if it recites essential structure or step, or if it is necessary to give life, meaning, and vitality to the claim. . . A preamble is not limiting, however, where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.") (internal quotations omitted).

Despite HCI's claim that "hearing aid" is not intended to be a limitation, the term is used sixty-seven times in the '076 patent, including once in the title ("*Hearing Aid* Ear Piece Having Disposable Compressible Polymeric Foam Sleeve"); five times in the "Field of the Invention" section ("The invention relates to the ear piece of a hearing aid. . .*The ear piece may be the hearing aid itself. . . .*"); twelve times in the "Summary of the Invention" ("[T]he invention provides a *hearing aid* comprising an ear piece. . .plus a sleeve. . . ."); seven times when describing the drawings ("Figure 1 is a longitudinal cross-section through a portion of a preferred *hearing aid of the invention. . . .*"); and in twenty of the forty-three claims (Claim 2: "*Hearing aid as defined in claim 1. . . .*") (emphasis added in all cases). The patentees clearly intended "hearing aid" to be a limitation on the claims; it is needed to give "life, meaning, and vitality" to

the claims rather than merely stating a purpose or intended use of the invention. *See Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (The preamble phrase "blown-film" was a claim limitation where "[t]he specification is replete with references to the invention as a 'blown-film' liner, including the title of the patent itself[1] and the 'Summary of the Invention.' The phrase is used repeatedly to describe the preferred embodiments, and the entire preamble 'blown-film textured liner' is restated in each of the patent's seven claims. Our analysis shows that the inventor considered that the 'blown-film' preamble language represented an important characteristic of the claimed invention."); *American Medical Sys., Inc. v. Biolitech, Inc.*, 569 F. Supp. 2d 313, 319 (D. Mass. 2008) (finding the preamble claim term "photoselective vaporization," which appeared in the patent's title and was featured prominently in the patent specification and claims, was limiting).

ii. *Construction of term*

Shure essentially argues that this term should be construed to exclude its earphone and headphone products because (1) the patent specification distinguishes prior art on the basis that it covered a "lightweight headphone set" and (2) anything other than a product which enabled a "person with hearing difficulties to comfortably wear hearing aid devices" was disclaimed during prosecution.

---

[1]There appears to be some tension between using, as in *Poly-America*, the presence of a preamble term in the patent title as indicative of its overall importance and the Federal Circuit's general disfavor of referring to a patent title in interpreting patent claims. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1311-13 (Fed. Cir. 1999). However, this court is not using the patent title to interpret "hearing aid"; rather, it is merely noting that the term's presence in the patent title tends to reinforce the conclusion that the inventors considered "hearing aid" to be an important phrase.

In the '076 patent specification, the patentees state that United States Reissue Patent No. 29,487 to Gardner[2] "does not concern hearing aids, but describes an earplug. . . [which] can be. . . employed as a covering over a tubular tip portion of a lightweight headphone set." Col. 1, l.59 - col. 2, l. 1. However, this is not the smoking gun Shure claims it to be, as the patentees were distinguishing between their "hearing aid" – which they state elsewhere is comprised of an ear piece and a disposable foam sleeve – and the earplug claimed by Gardner – which is analogous only to the foam sleeve and is then fitted over the tubular tip portion (the equivalent of the '076 patent's "ear piece") of a headphone set. The patentees also state that the difference between Gardner and the '076 patent is that "Gardner does not indicate how the plug is prevented from remaining in the ear canal if the tubular tip portion is accidentally dislodged or simply pulled out," col. 2, ll. 2-5, not that Gardner was distinguishable because it covered headphones, rather than the "hearing aid" claimed in the '076 patent.[3]

---

[2]The '487 patent was reissued on December 6, 1977 and is not included as an exhibit to Shure's motion. What was actually submitted as Exhibit 20 to that motion is the Abstract and Figures 1-2 of the original Gardner patent, U.S. Patent No. 3,811,437, which issued on May 21, 1974. The reissue patent added claims 11-19, changed several words in claim 1, and added Figure 3.

[3]It is also true that there are several places in the specification which strongly indicate that a "hearing aid" is something fitted by an audiologist. *See, e.g.*, col. 1, ll. 19-29 (describing the procedure of fitting a "hearing aid" through creating an impression of an individual's ear canal and using the impression to mold an ear piece as "requiring two visits to fit a person with a hearing aid"); col. 2, ll. 31-42 (describing the novel sleeve of the invention as "conveniently fitted by an audiologist to almost any user" and further providing that the "audiologist will be able to provide each user with the best acoustical fit."). However, Shure points to nothing in the specification or prosecution history that supports the conclusion that the only thing an audiologist can fit is a conventional "hearing aid." Audiologists are regularly advertised as providing headphone users with "the best possible acoustical fit" between his or her ear canal and the device. *See, e.g.*, Shure – 2005 Press Releases: Shure, Sensaphonics to offer free ear impressions at NAMM, *available at*
http://www.shure.com/PersonalAudio/PressRoom/PressReleaseArchive/2005PressReleases/

Shure also points to a single statement in the prosecution history of the '076 patent where, in an amendment, the patentees described the invention as "a device that enables persons with hearing difficulties to comfortably wear hearing aid devices." Amendment of 10/5/87, Def. Mot. Sum. J., Ex. 10, at p. 5 [Doc. # 97]. "[P}rosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage, such as an amendment to overcome a rejection." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1327 (Fed. Cir. 2003).

This statement was made under the heading "The Invention" and in response to an office action which rejected certain claims, including claim 1, as unpatentable over United States Patent Nos. 3,169,600 (the Thomas patent) and 4,253,452 (the Powers patent). Prosecution History of '076 Patent, Pl. Resp., Ex. D, at pp. 4-5 of 8 [Doc. # 108].[4] Again, this statement is not as persuasive as Shure suggests, since the patentees state only that the device enables "persons with hearing difficulties" to comfortably wear hearing aids. There is no indication that the term was intended to specifically exclude other devices such as headphones or musicians' monitors.

---

us_corp_press_rel_namm_ear (offering free custom ear impressions by a trained audiologist at a trade show); Custom Fit In-Ear Musicians' Monitors: Westone, available at http://www.westone.com/content/21.html (Advertising musicians' monitors which require custom fitting by an audiologist).

[4]Unlike HCI, which provided most of the Office Action and subsequent Amendment as Exhibit D, Shure failed to provide any portion of the Office Action as an exhibit and supplied only one page of the Amendment. Shure did this not just once, but twice, both in its initial motion (Exhibit 10) and its reply brief (Exhibit 3) As a result, based solely on Shure's submission, the court would have been unable to read the statement in context in order to determine whether the statement merely described the invention, or whether it was a clear disavowal provided to overcome a prior art rejection. The court trusts that this was an honest mistake, rather than an attempt by Shure to deliberately mislead the court by omitting information that would tend to undermine its position.

Further, the Examiner rejected the claims over the Thomas patent, which taught using a soft polymeric material as a sleeve for an earpiece, in light of the Powers patent, which taught polyurethane foam used as an earpiece with certain characteristics. In doing so, the Examiner noted that Thomas taught that the foam material had frictional means for disposably attaching the sleeve to an ear piece where there is an inherent relationship between the holding and pullout value due to this frictional force. *See id.* In their response, the patentees distinguished Thomas and Powers on these grounds – i.e., the composition and properties of the sleeve, as well as the holding and pullout values. *Id.* at pp. 6-7. There is no indication, much less a clear disavowal, that the patentees included the statement Shure points to in their Amendment to overcome any kind of prior art rejection or to narrow claim scope.

Shure also argues that a comparison of the '151 and '076 patent specifications further supports the conclusion that a "hearing aid" in the '076 patent was meant to exclude headphones. The patent application that eventually issued as the '151 patent was a continuation-in-part[5] of the application which issued as the '076 patent. The two specifications have several key differences. The Abstract of the '151 patent states that a "hearing aid. . .includes any sound transmission device," a description that is missing in the '076 patent, and specifically defines a hearing aid as including "any sound transmission device, such as ear phones, audio or transcription headsets, or

---

[5]A continuation-in-part is an application which is "filed during the lifetime of an earlier non[-]provisional application, repeating some substantial portion or all of the earlier non[-]provisional application and *adding matter not disclosed* in the said earlier non[-]provisional application." Manual of Patent Examining Procedure § 201.08 (emphasis in original); *see also Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316 at n.2 (Fed. Cir. 2008) ("The difference between a continuation application and a continuation-in-part application is that a continuation contains the same disclosure found in an earlier application, whereas a continuation-in-part contains a portion or all of the disclosure of an earlier application together with added matter not present in the earlier application.").

the like." Col. 2, ll. 28-31. In all, the patentees qualified their definition of "hearing aid" as including "any sound transmission device" seven times in the '151 patent.

However, any argument that the term "hearing aid" in the '076 patent can be defined by reference to the '151 patent would be unavailing. While it is true a continuation-in-part application builds on a parent application while also disclosing new subject matter, *see Technology Licensing Corp.*, 545 F.3d 1316 at n.2,

> By definition, the invention of a CIP [continuation-in-part application] may be less than the invention of the parent application. We cannot, therefore, limit the claims of the parent application based solely on what is described by the inventor as the 'invention' of the CIP. Furthermore, the main invention of the CIP cannot be relied upon to determine what has always been stressed as the principal accomplishment of the [parent application].

*Total Containment, Inc. v. Intelpro Corp.*, 217 F.3d 852 at *8 (Fed. Cir. 1999) (table).

The '076 patent clearly states that "hearing aids utilizing this disposable sleeve enable the user to hear better, that is hear better quality sound." Col. 2, ll. 27-28; *see also* col. 7, ll. 5-7. This interpretation is also consistent with the ordinary meaning of the term "hearing aid." *See, e.g.*, Academic Press: Dictionary of Science and Technology 997 (1992) (a "hearing aid" is "any device used to amplify sound for improved hearing"). The court will therefore construe this term as follows:

> **"Hearing aid"** means **"a device that enables the user to hear better quality sound."**

### b. Construction of "sound transmission device"

With respect to "sound transmission device," HCI suggests that the term be construed as "a device for providing sound to a user." Shure proposes the same construction as it did for "hearing aid." Unlike "hearing aid," this term is found in the body, rather than the preamble, of

claim 36, and is used to describe what the disposable sleeve is attached to. The phrase is not found anywhere in the '076 patent outside of claims 36 and 40.

Shure's suggestion that "sound transmission device" means the same thing as a "hearing aid" is not well-taken. As a general rule, "[i]n the absence of any evidence to the contrary, we must presume that the use of . . .different terms in the claims connotes different meanings." *Applied Medical Resources Corp. v. United States Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) (internal quotation omitted); *see also Helmsderfer v. Bobrick Washroom Equipment, Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("Our precedent instructs that different claim terms are presumed to have different meanings.").

No special definition for this term was provided by the patentees, and nothing in the specification indicates that anything other than ordinary meaning was intended. The '076 patent, when read as a whole, is directed toward a device by, or through, which sound is transmitted that is inserted into the ear canal of the user. Shure has provided no reason for the court to limit this term, other than the arguments considered and rejected above. The ordinary meaning of the word "transmit" is "pass," "send," or "convey." *See, e.g.*, Academic Press: Dictionary of Science and Technology 2251 (1992) ("transmit" means "to cause. . .sound. . . to pass through a medium"); The American Heritage Dictionary 865-66 (2004) ("transmit" means "1. to send from one person, place, or thing to another;. . .5. to convey. . . from one part of a mechanism to another."). The court will therefore construe the terms as follows:

**"Sound transmission device"** means **"a device that conveys sound to a user."**

In light of the court's construction of "hearing aid" and "sound transmission device," Shure's argument that it cannot infringe the asserted claims of the '076 patent because its products are not "hearing aids" or "sound transmission devices" is rejected.

2. *'076 patent – "fastening means"– and '151 patent – "disposably attaching means"*

Based on a careful and thorough review of the record, the court is persuaded that there are genuine issues of material fact as to whether Shure's accused devices have the "fastening" means required by the asserted claims of the '076 patent and the "means on said exterior surface for disposably attaching the duct of the sleeve to a connecting portion" as required by claims 1, 13, and 19 of the '151 patent.

3. *Infringement of the '920 patent*

Because the court previously found asserted claims 1 and 2 of the '920 patent indefinite, *see* Doc. # 118 at p. 13, it does not reach Shure's argument that its accused devices do not infringe these claims because they do not contain a "thin flexible membrane" and are not "readily installed and replaced by a user."

IT IS THEREFORE ORDERED that Defendant Shure, Inc.'s Motion for Summary Judgment of Non-Infringement [Doc. # 97] is DENIED.

So **ORDERED** and **SIGNED** this **16** day of **December, 2008.**

_____
Ron Clark, United States District Judge