IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| HEARING COMPONENTS, INC., | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 9:07-CV-104 |
| | § | |
| v. | § | JUDGE RON CLARK |
| | § | |
| SHURE, INC. | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM AND ORDER ON CLAIMS OF PATENT MISUSE

Plaintiff Hearing Components, Inc. filed suit against Defendant Shure, Inc. claiming infringement of United States Patent Nos. 4,880,076; 5,002,151; and 5,401,920. The '076 and '151 patents are directed toward a hearing aid ear piece or other sound transmission device connected to a disposable compressible foam sleeve. A bench trial was held on the equitable issues of laches and patent misuse on January 20, 2009. The court denied Shure's laches claims on the record, but reserved the issue of patent misuse at that time.[1]

Because Shure has not established that any of the complained-of limitations in HCI's licensing agreements constitute patent misuse, either per se or under a "rule of reason" analysis, the court will deny Shure's claims.

---

[1]Having received proposed findings of fact from both parties, the court will not enter separate findings of fact, but will incorporate its findings in this memorandum.

# I. Applicable Law

The doctrine of patent misuse "relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage. Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant." *C.R. Bard Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998).

> The patent misuse doctrine is an extension of the equitable doctrine of unclean hands, whereby a court of equity will not lend its support to enforcement of a patent that has been misused. Patent misuse arose, as an equitable defense available to the accused infringer, from the desire to restrain practices that did not in themselves violate any law, but that drew anticompetitive strength from the patent right, and thus were deemed to be contrary to public policy. When used successfully, this defense results in rendering the patent unenforceable until the misuse is purged.

*Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1025 (Fed. Cir. 2008) (internal citation excluded); *see also Bard*, 157 F.3d at 1372 ("Patent misuse arises in equity, and a holding of misuse renders the patent unenforceable until the misuse is purged; it does not, of itself, invalidate the patent.").

While patent misuse is viewed as a " broader wrong" than an antitrust violation, the key inquiry will be whether the patentee has "impermissibly broadened the scope of the patent grant with anti[-]competitive effect" by "imposing conditions that derive their force from the patent." *Bard*, 157 F.3d at 1372. The activities characterized as "patent misuse" do not include a "general notion of 'wrongful' use"; rather, the doctrine has for the most part been confined to a few specific practices, such as enforced package licensing, price restraints, or extended royalty terms. *Id.* at 1373. The Federal Circuit has cautioned that the doctrine should be construed fairly

narrowly. *Id.* ("the body of misuse law and precedent need not be enlarged into an open-ended pitfall for patent-supported commerce.").

To successfully assert a patent misuse defense, Shure must demonstrate that HCI has "impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect."*Virginia Panel Corp. v. Mac Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997). Certain practices constitute patent misuse per se, "including so-called 'tying' arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, and arrangements in which a patentee effectively extends the term of the patent by requiring post-expiration royalties." *Id.* at 869 (internal citations omitted). At the same time, 35 U.S.C. § 271(d) provides that certain enumerated actions or tying arrangements, in the absence of market power, do not constitute patent misuse.[2]

In the situation where a practice alleged to constitute patent misuse is neither per se patent misuse nor specifically excluded from a misuse analysis by Section 271(d), "a court must determine if that practice is reasonably within the patent grant, *i.e.,* that it relates to subject

---

[2]Section 271(d) states that:

(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

matter within the scope of the patent claims." *Virginia Panel*, 133 F.3d at 869 (internal quotation omitted). If the practice's effect is to extend the patentee's statutory rights and does so with an anti-competitive effect, that practice must be analyzed in accordance with the "rule of reason." *Id.* Under the rule of reason, the fact finder decides whether the questioned practice imposes an "unreasonable restraint on competition," taking into account a number of factors, including (1) specific information about the relevant business; (2) the business's condition before and after the restraint was imposed, and (3) the restraint's history, nature, and effect. *Id.*

It is somewhat unclear whether false marking is patent misuse at all, much less patent misuse per se. However, this practice "clearly injures" the "important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain" because

> the act of false marking misleads the public into believing that a patentee controls the article in question (as well as like articles), externalizes the risk of error in the determination, placing it on the public rather than the manufacturer or seller of the article, and increases the cost to the public of ascertaining whether a patentee in fact controls the intellectual property embodied in an article.

*Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1356-57 (Fed. Cir. 2005). False marking under 35 U.S.C. § 292(a) requires proof of four elements: (1) a marking importing that an object is patented; (2) falsely affixed to; (3) an unpatented article; (4) with intent to deceive the public. *Id.* at 1351.

"Intent to deceive, while subjective in nature, is established in law by objective criteria. . . Thus, objective standards' control and the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there

was a fraudulent intent." *Id.* at 1352 (internal quotation omitted). To establish knowledge of falsity, Shure must show by a preponderance of the evidence that HCI did not have a reasonable belief that the articles were properly marked (i.e., covered by a patent). Absent such proof of lack of reasonable belief, no liability under the rises to the level of statutory deception is a question of fact. *Id.* at 1253.

## II. Analysis

Shure alleges that HCI entered into sixteen licenses[3] in the period between July 1, 2004 and May 15, 2008, and that the licensing agreements contain provisions that constitute patent misuse in one or more of the following four ways: (1) providing for a post-expiration marking requirement (i.e., requiring licensees to mark expired patent numbers on their products); (2) requiring post-expiration supply obligations (i.e., requiring the licensees to buy HCI products after the patents-in-suit expired); (3) providing for an undiminishing royalty rate (i.e., not decreasing the royalty rate the licensee paid for licensing both patents in suit after the '076 patent expired on December 5, 2006); and (4) including a potential retroactive royalty increase (i.e., the royalty rate paid by the licensee could increase from 3% to 5% after expiration of the patents, depending on what happened up to five years after the '151 patent expired on March 26, 2008). The following chart is drawn from Shure's Proposed Findings of Fact and Conclusions of Law [Doc. # 129], and summarizes Shure's allegations:

---

[3] Although there are sixteen different licensees, Shure's claims actually encompass nineteen license agreements. Two of the licensees – Aloft Technologies, Inc. and Antonio Precise Products Manufactory, Ltd. – entered into multiple license agreements with HCI.

| Licensee/ Sublicensee | Effective Date | Post-Expiration Supply Obligation? | Un-diminishing royalty rate? | Potential Retroactive Royalty Increase? | Post-Expiration Marking Requirement? | Exhibit No. |
|---|---|---|---|---|---|---|
| Aloft Technologies, Inc. | 7/1/04 | | X | | | DX104 |
| Antonio Precise Products Manufactory, Ltd. | 6/1/05 | | X | | | DX105 |
| Outside the Box, Inc. | 7/1/05 | | X | | | DX198 |
| Trick Audio LLC | 11/1/05 | | X | | | DX175 |
| Communications and Ear Protection, Inc. | 12/1/05 | | X | | | DX177 |
| A Power Ltd. | 5/1/06 | X | X | | X | DX193 |
| Yazawa Corp. | 8/4/06 | X | X | | X | DX201 |
| Antonio Precise Prods. Manuf. Ltd. | 8/17/06 | | X | | | DX194 |
| Nacre AS | 9/22/06 | X | X | X | X | DX103 |
| Armour Home Electronics, Ltd. | 9/27/06 | | X | | X | DX196 |
| Micro Optics Technologies, Inc. | 10/21/06 | X | X | | X | DX106 |
| Aloft Technologies, Inc. | 1/22/07 | X | N/A[4] | | | DX104 |

---

[4]The '076 patent expired in December 2006. Shure alleges that the license agreements HCI entered into after that date with six new licensees – all licensees with an "N/A" in this column except Aloft Technologies, Inc. and Antonio Precise Products Manufactory, Ltd. – licensed the '076 patent after it had expired.

| | | | | | | |
|---|---|---|---|---|---|---|
| Shenzhen Grandsun Electric Co., Ltd. | 2/12/07 | X | N/A | X | X | DX110 |
| Antonio Precise Products Manufactory, Ltd. | 7/1/07 | X | N/A | | X | DX195 |
| Phillips Electronics | 10/26/07 | | N/A | | X | DX95 |
| Skullcandy | 11/15/07 | X | N/A | | X | DX107 |
| Yashima Electric Co. | 11/29/07 | | N/A | | | DX200 |
| Ultimate Ears, LLC | 4/14/08 | X | N/A | | X | DX108 |
| Blue Ant Wireless Pty. Ltd. | 5/15/08 | X | N/A | | X | DX197 |

A.    Providing for a post-expiration marking requirement

Shure's first argument is that by requiring licensees to mark expired patent numbers on their products, HCI has engaged in patent misuse. Specifically, Shure suggests that because the license agreements do not provide for the removal of expired patent numbers, continued marking of a licensee's products after expiration of the '076 and/or '151 patents is patent misuse due to false marking. The court makes the following findings with respect to this claim:

1.    Eleven agreements require post-expiration marking, and contain a provision similar to the following:

MARKINGS ON LICENSED PRODUCTS:

Patent Notice – The following wording will be on each Licensed Product package and replacement tip package. "Manufactured under Hearing Components' U.S. Patent

7

Numbers 4,880,076 and 5,002,151 *and International Equivalents*. Other patents pending."

*See* DX 110, at ¶ 6.0 (emphasis added).

2.     The court finds specific evidence that only two licensees, Blue Ant and Ultimate Ears, ever actually sold any products in the United States.   Tr. at p.1543, ll. 15-21 (Blue Ant); Tr. at p. 1555, ll. 5-21 (Ultimate Ears).

3.     HCI had foreign equivalents of the patents-in-suit in Australia, Canada, Denmark, France, Germany, Japan, Korea, and the United Kingdom, and these equivalents do not expire until 2010 (all but Korea) or 2011 (Korea).  DX 316, at p. 16, n.35; *see also* Tr. at p. 1565, ll. 15-17; p. 1538, l. 7 - p. 1539, l. 2.  (Shure did not dispute either of these assertions during the bench trial.)

4.     Shenzhen Grandsun Electric Co.'s license was limited to the "Chinese market." Because HCI was not exactly sure what that meant, this license was never actually enforced.  Tr. at p. 1564, l. 9 - p. 1565, l. 14.  Although there was no foreign equivalent to the '076 and '151 patents in China, DX 316 at p. 16 and n.35, there was no evidence that Shenzhen ever sold products in the United States, marked with the '076 and '151 patent numbers or otherwise.

5.     Regardless of the wording of the license agreements, there was no evidence that any item marked with an expired patent number was actually imported into, made in, sold in, or used in the United States.  (At best, Shure elicited testimony from HCI's in-house general counsel, David Crompton, that Blue Ant and Ultimate Ears both entered into licensing agreements after the '076 and '151 patents had expired in the United States; that both sold products in the United States; and that under the licensing agreements, any covered products would be marked with the '076

and '151 patent numbers.  Tr. at p.1543, ll. 15-21 [Blue Ant]; Tr. at p. 1555, ll. 5-21 [Ultimate Ears].  However, no samples of actual Blue Ant or Ultimate Ears products with the patent numbers on them were submitted to the court.)

6.      The court finds credible the testimony of Dr. Olivera that HCI was a "small business" that was always "looking for new customers."  Tr. at p. 1635, ll. 10-19.

7.      There is no evidence that would suggest that HCI's licenses were coerced or not entered into voluntarily.

8.      HCI did not have the requisite intent to deceive under the false marking statute.  Shure presented insufficient evidence that HCI lacked a reasonable belief that its licensees' products were properly marked.

## I.      Patent misuse per se and exclusion under Section 271(d)

Shure points to, and the court has found, no case which terms the marking provisions included in HCI's license agreements patent misuse per se.  False marking is not mentioned in Section 271(d), so it is not excluded from patent misuse under that statutory provision.

## II.      Extending patent rights through anti-competitive effect

If a certain practice is not patent misuse *per se* and is not specifically excluded under Section 271(d), a court must then determine if that practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect.  If so, that practice must be analyzed in accordance with the "rule of reason." *Id.*  Under this analysis, the court will determine whether the questioned practice imposes an unreasonable restraint on competition,

taking into account a variety of factors, including (1) specific information about the relevant business; (2) the business's condition before and after the restraint was imposed, and (3) the restraint's history, nature, and effect. *Id.*

There are several problems with any argument that HCI's actions extended its patent rights with an anti-competitive effect. First, HCI asserted, and Shure did not dispute, that the '076 and/or '151 patents have foreign equivalents which do not expire until 2010, 2011, or 2013[5]. The licensing agreements require that the phrase "and International Equivalents" be included in the marking licensees place on their products. The false marking statute, Section 292, "only prohibits the marking of articles that are not subject to either foreign or domestic patent protection." *Kor-CT, LLC v. Savvier, Inc.*, 344 F. Supp. 2d 847, 857 (D. Conn. 2004); *see also Project Strategies Corp. v. National Communications Corp.*, 948 F. Supp. 218, 225-27 (E.D.N.Y. 1996). While it is true that marking products with expired patent numbers can be false marking under Section 292, *Pequignot v. Solo Cup Co.*, 540 F. Supp. 2d 649, 654 (E.D. Va. 2008), Shure does not dispute that foreign equivalents of the '076 and/or '151 patents remain in force for several more years.

Section 292 is also penal in nature, providing a civil fine to the party mismarking the product for each violation. *Clontech Labs., Inc. v. Invitrogen Corp.*, 406 F.3d 1347, 1353 (Fed.

---

[5]Mr. Crompton testified during the bench trial that the Korean equivalent does not expire until 2013. This may have been a misstatement, as Dr. Ugone cites earlier testimony and e-mails from Mr. Crompton in which he states that the foreign equivalents expire in 2010 or 2011, depending on the country. No matter which date is used, the point is that Shure does not dispute that the foreign equivalents of the patents-in-suit have not yet expired.

Cir. 2005).  Shure cites, and the court has found, no case or statute which even suggests that the false marking statute to be the basis for a patent misuse claim.

It is also somewhat unclear whether a patent holder can even be liable for patent misuse if the licensing provisions complained of were not enforced in the United States.  If one analogizes licensing agreements and tying arrangements in antitrust law to patent law[6], several early cases might imply that it is immaterial whether a contract provision purporting to increase a patent monopoly was ever actually enforced in the United States, because the key is that the patent holder had the power to do so under the contract.  *See, e.g., United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 458, 42 S. Ct. 363, 365 (1922) ("The power to enforce them [tying restrictions] is omnipresent, and their restraining influence constantly operates upon competitors and lessees. The fact that the lessor in many instances forbore to enforce these provisions does not make them any less agreements within the condemnation of the Clayton Act."); *F.C. Russell Co. v. Consumers Insulation Co.*, 226 F.2d 373, 376 (3d Cir. 1955); *Krampe v. Ideal Indus., Inc.*, 347 F. Supp. 1384, 1387 (D.C. Ill. 1972).

However, in both *United Shoe* and *F.C. Russell*, the licensees were domestic United States corporations.  In contrast, many of the licensing agreements HCI entered into were with foreign companies.  While most of the contracts may have permitted world-wide sales, Shure

---

[6]The analogy is apt, since patent misuse and antitrust violations, while not identical, are related causes of action.  *See, e.g., Bard*, 157 F.3d at 1372 ("Patent misuse is viewed as a broader wrong than antitrust violation because of the economic power that may be derived from the patentee's right to exclude.  Thus, misuse may arise when the conditions of antitrust violation are not met. . .The key inquiry is whether, by imposing conditions that derive their force from the patent, the patentee has impermissibly broadened the scope of the patent grant with anticompetitive effect.")

failed to present a single example of an allegedly mismarked product actually imported into, or made, used, offered for sale, or sold in, the United States, either by a foreign company (e.g., Blue Ant) or a domestic company (e.g., Ultimate Ears).

It is black letter law that a Defendant can only be liable for importing into, making, using, offering to sell, or selling a patented invention "within the United States."  35 U.S.C. § 271(a); *see also Aluminum Co. of America v. Sperry Prods., Inc.*, 285 F.2d 911, 925 (6th Cir. 1960) ("Foreign patents grant no monopolies in the United States, nor do United States patents grant any monopolies in foreign countries.  A patent is granted by a sovereign power and its rights, privileges, and obligations begin and end with the country that issues it.").[7]  And although patent misuse is typically viewed as a "broader wrong" than an anti-trust violation, the Sherman Act was amended in 1982 to restrict the jurisdiction of an American court over alleged anti-trust violations based on foreign activities.  15 U.S.C. § 6a; *see also Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 234-35 (D. Del. 1984).  It would make little sense to restrict a patent holder to enforcement of its rights in the United States, while simultaneously permitting an accused infringer to use the patent holder's foreign activities as the basis for a patent misuse claim.

There was insufficient evidence to support a finding that HCI required a licensee to mark products to be sold in the United States under the licensing agreements after the '076 and '151 patents have expired.  While Shure did elicit some testimony that two licensees, Blue Ant and

---

[7]Perhaps marking a product with United States patent numbers gives a certain cachet in some foreign countries, just as the word "French" seems to increase sales of perfume here.  It is up to that country, rather than this court, to decide whether using an expired United States patent number harms its citizens.

Ultimate Ears, entered into licensing agreements after the '076 and '151 patents had expired in the United States with a provision that any covered products would be marked with the '076 and '151 patent numbers, Shure provided no samples of actual Blue Ant or Ultimate Ears products with the patent numbers on them to the court. In other words, there was little to no evidence presented regarding the first three elements of any false marking cause of action – namely, that any licensee's product had a marking stating that it was patented, which was falsely affixed to an unpatented article.

The fourth element Shure is required to demonstrate under a false marking theory is that HCI had the intent to deceive the public. To do so, Shure must show that HCI did not have a reasonable belief that the articles were properly marked – i.e., that they were covered by a valid patent or patents. The court is not persuaded by the limited evidence available that HCI did not have such a reasonable belief. There was testimony during the bench trial, which Shure did not dispute, that HCI had foreign equivalents of the patents-in-suit in other countries which do not expire until 2010 or 2011. HCI's purpose in requiring licensees to mark their products with the '076 and '151 patent numbers was to direct an interested party to the foreign equivalents of these patents, making it easier for a company or individual to find out what the patent protection on a given device is. The court finds the evidence does not show that HCI had the requisite intent to deceive.

### III.     Rule of reason analysis

As discussed above, it is unclear that HCI's actions in this case with respect to marking have the effect of extending its statutory rights with anti-competitive effect. Even assuming they do, Shure has put forth insufficient evidence on the *Virginia Panel* factors to permit the court to

13

find patent misuse under a "rule of reason" analysis. Dr. Olivera testified that HCI was a "small business" that was always "looking for new customers." Tr. at p. 1635, ll. 10-19. The court does not find that HCI's condition changed after the licensing agreements with the marking provisions were entered into. The court finds there is insufficient evidence to make a determination regarding the restraint's history, nature, and effect.

The court also notes that "[v]oluntariness of the licensee's agreement to the royalty provisions is a key consideration" when analyzing potential patent misuse. *Engel Industries, Inc. v. Lockformer Co.*, 96 F.3d 1398, 1408 (Fed. Cir. 1996); *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) (patent misuse "relates generally to the use of patent rights to obtain *or to coerce* an unfair commercial advantage") (emphasis added); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 2008 WL 203385 (N.D. Ill. Jan. 18, 2008). Shure has not produced any evidence that would so much as hint that HCI's licensees were anything but willing to enter into agreements with this clause. Even assuming that this provision has anti-competitive effect, Shure has put forth little to no specific evidence on the *Virginia Panel* factors that would permit the court to conclude that this practice is patent misuse.

While the court recognizes that false marking has the potential to injure the strong public interest in full and free competition by indicating that something is protected under a patent when it is, in fact, part of the public domain, it is a stretch to conclude that HCI's practice of including a marking provision in its licensing agreements has the effect of extending its statutory rights with an anti-competitive effect. The Federal Circuit has cautioned that the doctrine of patent misuse should be construed fairly narrowly, *C.R. Bard Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1373 (Fed. Cir. 1998), and Shure's theory would run contrary to that end.

B.      Post-expiration supply obligations

Shure next alleges that ten of the nineteen license agreements required the licensees to

buy HCI products after the patents-in-suit expired.  The court makes the following findings

regarding Shure's claim:

1.      Ten agreements contain a provision similar to the clause found in the agreement between

HCI and A Power Limited:

> SUBLICENSED PRODUCTS means hearing-in-noise devices that are covered by a
> claim of a PATENT and include means for releasably securing LICENSOR'S [HCI]
> disposable foam sleeves, with such means manufactured to LICENSOR'S specifications.
> SUBLICENSEE [A Power Limited] agrees that all foam sleeves to be used with
> Sublicensed products will be supplied by LICENSOR to assure proper coupling to
> LICENSOR'S specified means.

DX 193, at ¶ 9.2.

2.      Later agreements are more specific:

> LICENSEE [Nacre AS] agrees to exclusively buy special made for LICENSEE Comply$^{TM}$
> Canal Tips from LICENSOR [HCI] for a period of 5 years after the last US patent ['076
> and '151] expires for LICENSEE'S products that use polymeric foam tips.

DX 103, at  ¶ 5.2; *see also* DX 104 ("Licensee [Aloft Technologies, Inc.] agrees to exclusively

buy Comply$^{TM}$ Canal Tips from Licensor [HCI] for a period of five (5) years, after the last patent

expires, for use on Licensee's products that can utilize foam tips."); DX 110 (same); DX 107

("Skullcandy will agree to use Comply$^{TM}$ Foam Tips for all foam tip needs for two years from the

start of retail launch [dated 11/15/07]).

3.      Four of the ten agreements were entered into before the '076 patent expired; four were

entered into after the '076 patent expired in the United States December 2006 but while the '151

patent was still in force; and two were entered into after the '151 patent expired in the United States in March 2008.

4.      There is insufficient evidence to find that HCI had the type of market power envisioned under Section 271(d)(5) that would make a tying agreement of this nature statutory patent misuse.  To the contrary, the court finds credible the testimony of Dr. Olivera that HCI was a "small business" that was always "looking for new customers."  Tr. at p. 1635, ll. 10-19.  HCI's market power was not discussed during the bench trial, or in Dr. Ugone's expert report (DX 316).

5.      There is no evidence that would suggest that HCI's licenses were coerced or not entered into voluntarily.

## I.      Patent misuse per se or under Section 271(d)

"[A] patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se," *Brulotte v. Thys Co.*, 379 U.S. 29, 32 (1964).   However, the Court in *Brulotte* was largely concerned with royalties paid to patentees after a patent has expired; here, HCI has instead conditioned grant of a license on the licensor's continued purchase of HCI's foam tips for five years after the patents-in-suit have expired.  Shure has not cited, and the court has not found, any case in which a post-expiration supply obligation was found to be patent misuse per se.

 Tying agreements such as this one are also not patent misuse under 35 U.S.C. § 271(d)(5) "unless, in view of the circumstances, the patent owner had market power in the relevant market for the patent or patented product on which the license or sale is conditioned." However, Shure also put forth little, if any, evidence that HCI had the type of market power

envisioned under Section 271(d)(5) that would make a tying agreement of this nature statutory patent misuse. In short, there is insufficient evidence that these practices extended HCI's patent rights with anti-competitive effect.

## II. Extension of patent rights with anti-competitive effect and rule of reason analysis

Assuming, for the sake of argument, that Shure has demonstrated that HCI's tying arrangements extended its patent rights with anti-competitive effect, none of the post-expiration supply obligations appear to be patent misuse under a "rule of reason" analysis.

Shure has presented insufficient evidence on the *Virginia Panel* factors to permit the court to find patent misuse under a "rule of reason" analysis. As already discussed, Dr. Olivera testified that HCI was a small business. Tr. at p. 1635, ll. 10-19. The court is not persuaded that HCI's condition changed after the license agreements with the marking provisions were entered into. There was little, if any, information presented regarding the restraint's history, nature, and effect, and not even a suggestion that HCI's licensees were anything other than willing to enter into agreements with this clause. The court finds that Shure has failed to prove patent misuse.

## C. Providing for an undiminishing royalty rate

Shure's third argument is that HCI's practice of not decreasing the royalty rate the licensee paid for licensing both patents in suit after the '076 patent expired is patent misuse. Shure's allegations on this point are actually two-fold: (1) with respect to the license agreements entered into before the '076 patent expired in December 2006, the agreements failed to decrease the royalty rate after the '076 patent expired; and (2) after December 2006, HCI licensed the '076 patent and/or the '151 patent after they had expired.

17

## I.     Pre-December 2006 agreements

The court makes the following findings with respect to this claim:

1.      There is no evidence that the licenses were not entered into voluntarily or were coerced.

2.      The court finds credible the testimony of Dr. Olivera that HCI was a "small business" that was always "looking for new customers."  Tr. at p. 1635, ll. 10-19.

As with post-expiration supply obligations, Shure has pointed to no case that terms the first practice patent misuse per se.  The practice is not exempted under Section 271(d), and Shure puts forth little to no evidence that this practice extended HCI's patent rights with any anti-competitive effect.

Even assuming there was an anti-competitive effect, consideration of the "rule of reason" analysis discussed above does not favor terming this practice patent misuse under these facts. Again, HCI is a small business.  The court does not find that HCI's condition changed after the license agreements with the marking provisions were entered into.  The court finds there is insufficient evidence to make a determination regarding the restraint's history, nature, and effect. The license agreements appear to be entered into voluntarily.

The court also notes the Federal Circuit has stated in a different context that:

> A licensee which has taken a license under both patents, choosing to use the inventions claimed in both patents in the same commercial process, must know that, in the absence of some agreement to the contrary, it is not excused from paying royalty after one of the patents expires while the other is still in force and the invention it claims is being used.

*General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1279 (Fed. Cir. 1992) (discussing double patenting).  In other words, after the '076 patent expired, the licensees knew

they still had to pay a royalty to continue to use the '151 patent. While decreasing the royalty rate the licensees paid on the remaining patent is one option that parties voluntarily entering into a license agreement can utilize, Shure has pointed to no case supporting the theory that failing to do so, without coercion, is patent misuse.[8] The court finds there is insufficient evidence to conclude that this practice is patent misuse.

## II.    Post December 2006 agreements

Shure's second argument is, at first blush, more compelling. The court makes the following findings with regards to this claim:

1.     The February 2007 agreement entered into with Shenzhen Grandsun Electronics Co. licensed the '076 patent. DX 110, at ¶ 9.1 ("PATENT or PATENTS means the following listed patents and all divisions, continuations, reissues, foreign equivalents, substitutes, and extensions thereof" and listing both the '076 and '151 patents).

---

[8]*Brulotte*, which only states that requiring payment of royalties after the last of the licensed patents expired is patent misuse, is not to the contrary and in fact specifically distinguishes the situation where only some of the licensed patents have expired. *Brulotte*, 379 U.S. at 33, 85 S. Ct. at 179; *see also Hull v. Brunswick Corp.*, 704 F.2d 1195 (10th Cir. 1983) ("Although the royalty rate does not change, the base for that rate changes. . .The lack of diminution in royalty rate for the use of one patent without another and the provisions for termination do not of themselves establish coercion.") (internal quotation omitted); *In re Yarn Processing Patent Validity Litigation*, 541 F.2d 1127, 1141-42 (5th Cir. 1979), *cert. denied*, 433 U.S. 910, 97 S. Ct. 2976 (1977) (provision that escalated royalties for one patent in package after expiration of another patent did not illegally extend life of first patent); *Sunrise Medical HHG, Inc. v. AirSep Corp.*, 95 F. Supp. 2d 348, 458 (W.D. Pa. 2000) ("the royalty rate need not diminish as patents included in a package license expire, as long as the licensee is not coerced."); *Lightwave Techs., Inc. v. Corning Glass Works*, 1991 WL 4737 at *2 (S.D.N.Y. Jan. 18, 1991) ("Coercion, or attempted coercion, is an essential element of patent misuse by improper patent packaging.").

2.      The '076 patent expired on December 5, 2006, and the '151 patent expired on March 26,

2008.  Doc. # 139, at p. 10.

3.      In addition to the agreement with Shenzhen, HCI entered into seven other license

agreements – five of which, like Shenzhen, were with new licensees and two of which were

continuations of prior agreements – which also licensed the '076 patent after December 5, 2006.

*See* DX 104; 110; 195; 95; 107; 200; 108; and 197.  Two of these agreements were entered into

after the '151 patent expired in March 2008.  DX 108 and 197.

4.      HCI's license agreements that require post-expiration marking contain a provision similar

to the following:

>       MARKINGS ON LICENSED PRODUCTS:
>
>       Patent Notice – The following wording will be on each Licensed Product package and
>       replacement tip package.  "Manufactured under Hearing Components' U.S. Patent
>       Numbers 4,880,076 and 5,002,151 *and International Equivalents*.  Other patents
>       pending."

*See* DX 110, at ¶ 6.0 (emphasis added).

5.      The court finds credible the testimony of Dr. Olivera that HCI was a "small business" that

was always "looking for new customers."  Tr. at p. 1635, ll. 10-19.

6.      There is no evidence that the licenses were not entered into voluntarily or were coerced.

>       a.      *Patent misuse per se or exemption under Section 271(d)*

Shure points to no case that terms this practice patent misuse per se, and it is not

specifically exempted under Section 271(d).

20

There is some support for the position that licensing an expired patent can still extend the patentee's rights with anti-competitive effect, even when the general public is not prohibited from using the device covered under the patent. *Prestole Corp. v. Tinnerman Prods., Inc.*, 271 F.2d 146, 155 (6th Cir. 1959). In *Prestole*, the license specifically excluded a device covered by a series of patents, one of which had already expired when the agreement was signed. The Sixth Circuit stated that the condition extended a monopoly in an expired patent, and

> [t]he fact that the general public, other than [the licensee] was not thereby forbidden the use of this then unpatented device and that [the licensee] might employ it in manufacturing equipment not containing the invention of the licensed patents does not, in our opinion, exonerate [the licensor] from a charge of attempting to extend, for its own purposes, a monopoly in an expired patent.

*Id.*

Here, the court has found that HCI has licensed one or both of the patents-in-suit after their expiration in the United States. However, as already discussed, HCI asserts, and Shure does not dispute, that foreign equivalents of the '076 and '151 patents remain in effect in Australia, Canada, Denmark, France, Germany, Japan, Korea, and the United Kingdom until 2010 or 2011. By including the language "and International Equivalents," HCI is licensing patents that, while possibly expired in the United States, have equivalents which remain valid in a number of foreign countries.

Additionally, the royalty ends with the expiration of the last patent. *See, e.g.*, DX 110, at ¶ 5.1. Unlike the license agreement in *Prestole*, HCI does not extend its monopoly beyond the expiration of the patents because it receives nothing in return – i.e., no royalty at all after the foreign equivalents of the last patent expires. While there is a provision requiring the licensee to

purchase HCI's foam tips for five years after expiration of the patents, the court has already found that neither the tying provision, or the failure to include a retroactive royalty decrease after expiration of the '076 patent, is patent misuse.

c.      *Rule of reason analysis*

Even assuming HCI's actions extended its patent rights with an anti-competitive effect, consideration of the "rule of reason" analysis discussed above does not favor terming this practice patent misuse under these facts.  HCI is a small business.  The court does not find that HCI's condition changed after the license agreements with the marking provisions were entered into.  The court finds there is insufficient evidence to make a determination regarding the restraint's history, nature, and effect.  Shure has neither presented any evidence that any of these agreements were coerced, nor that any mismarked item was ever imported into, made in, sold in, or used in the United States.  The court does not find that HCI has engaged in patent misuse.

D.      Including a potential retroactive royalty increase

Shure's final argument is that HCI's practice of permitting the royalty rate paid by the licensee to  increase from 3% to 5% after expiration of the patents, depending on what happened up to five years after the '151 patent expired, is patent misuse.  The court makes the following findings of fact with respect to this claim:

1.      This provision is found in only two of the license agreements, namely those HCI entered into with Shenzhen Grandsun Electronics (DX 110, ¶ 5.2.4) and Nacre AS (DX 103, ¶ 5.3.3).  The following clause is found in the Shenzhen agreement:

If 5.2.1 or 5.2.2 or 5.2.3 are not met, the Royalty will retroactively revert to 5% applied to all products sold on or after the date of this agreement until expiration of the last patent.

2.  Section 5.2.1 in the Shenzhen agreement states that the licensee agrees to exclusively purchase HCI's foam tips for a period of five years after the last patent expires for all of the licensee's products which use foam tips. *Id.*

3.  There is no evidence that the licenses were not entered into voluntarily or were coerced.

4.  The Shenzhen agreement applied only to the China market and was never actually enforced.

5.  There is no evidence that retroactive royalties were ever demanded or paid based on any products that were imported into, made in, sold in, or used in the United States by Nacre. Defense counsel's entire discussion of this agreement was couched in the hypothetical and does not provide any specific facts regarding enforcement or sales.  Tr. at p. 1527, ll. 4-18; p. 1531, l. 5 - 1535, l. 9.

6.  The court finds credible the testimony of Dr. Olivera that HCI was a "small business" that was always "looking for new customers."  Tr. at p. 1635, ll. 10-19.

Again, Shure has pointed to no case that terms this practice patent misuse per se.  The practice does not seem to be explicitly prohibited by Section 271(d), and that court has already found that the tying arrangement itself is not patent misuse under the facts of this case. There is insufficient evidence that the practice extended HCI's patent rights with any anti-competitive effect in any other way.

Even assuming there was an anti-competitive effect, consideration of the "rule of reason" analysis does not favor, under these facts, terming this practice patent misuse. HCI is a small business. HCI is a small business. The court does not find that HCI's condition changed after the license agreements with the marking provisions were entered into. The court finds there is insufficient evidence to make a determination regarding the restraint's history, nature, and effect. Shure has neither presented any evidence that any of these agreements were coerced, nor that any mismarked item was ever imported into, made in, sold in, or used in the United States. The court has already found that the Shenzhen agreement applied only to the China market and was never actually enforced. Similarly, Shure pointed to no evidence that any products were ever sold in the United States by Nacre, or that the retroactive royalty provision was ever enforced. The court does not find that HCI has engaged in patent misuse.

### III. Conclusion

For the reasons discussed above, the court will deny Shure's claims of patent misuse based on certain provisions included in HCI's licensing agreements, namely (1) providing for a post-expiration marking requirement; (2) requiring post-expiration supply obligations; (3) providing for an undiminishing royalty rate; and (4) including a potential retroactive royalty increase.

So **ORDERED** and **SIGNED** this **26** day of **March, 2009.**

_____
Ron Clark, United States District Judge